CONSOLIDATED–TOMOKA LAND
COMPANY et al., Plaintiffs,

v.

Earl L. BUTZ, as Secretary of the United
States Department of Agricul-
ture, et al., Defendants.

Civ. No. 70–244.

United States District Court,
M. D. Florida,
Orlando Division.

Oct. 16, 1972.

Fishback, Davis, Dominick & Simonet, Orlando, Fla., for plaintiffs.

Kendell W. Wherry, Asst. U. S. Atty., Orlando, Fla., Fred Harris, Jr., Regional Atty., U. S. Dept. of Agriculture, Atlanta, Ga., William Mount, Gen. Litigation Section, Civ. Div., U. S. Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION AND FINAL JUDGMENT

TJOFLAT, District Judge.

This case is before the Court on plaintiffs' motion for summary judgment. The plaintiffs in this case are growers and handlers of oranges in the Interior District of Florida. They challenge the validity of Marketing Order 914,[1] issued by the Secretary of Agriculture pursuant to the Agricultural Adjustment Act,[2] which regulates shipping quotas for oranges grown in the Interior District of Florida.[3] Basically, the Marketing Order provides for an Orange Marketing Committee which, under specified conditions, may set and impose quotas on the quantity of certain types of oranges which a grower or handler may ship in fresh form in interstate commerce.

Before a marketing order can be issued, it must be approved by two-thirds of the producers participating in a referendum on the question.[4] Any producer or grower of oranges during a determined period may vote in the referendum. In addition, if the producer is a member of a cooperative association of producers, his vote may be cast by the

---

1. 7 C.F.R. Part 914 (1971).

2. 7 U.S.C. § 601 et seq.

3. The Interior District of Florida is a production area comprised of at least forty counties in Florida. The boundaries of the district are defined in 7 C.F.R. § 914.15.

4. 7 U.S.C. § 608c(8) provides:

    That no order issued pursuant to this subsection shall be effective unless the Secretary of Agriculture determines that the issuance of such order is approved or favored:

    (A) By at least two thirds of the producers who . . . during a representative period determined by the Secretary, have been engaged, within the production area specified in such marketing agreement or order, in the production for market of the commodity specified therein, or who, during such representative period, have been engaged in the production of such commodity for sale in the marketing area specified in such marketing agreement, or order, or

    (B) By producers who, during such representative period, have produced for market at least two-thirds of the volume of such commodity produced for market within the production area specified in such marketing agreement or order, or who, during such representative period, have produced at least two-thirds of the volume of such commodity sold within the marketing area specified in such marketing agreement or order.

cooperative.[5] The dispute in this case centers around the conduct of the referendum and whether the issuance of the marketing order was, in fact, approved by two-thirds of those entitled to participate in the referendum.

The plaintiffs urge several grounds for holding the referendum and, therefore, the issuance of the marketing order, invalid. First, the plaintiffs point out that the largest single ballot, accounting for 1,604 votes, was cast by one cooperative association, Seald-Sweet Growers, Inc. Plaintiffs contend that Seald-Sweet's ballot should be disqualified because it is not a cooperative association of producers as defined by law and is, therefore, not entitled to vote in the referendum. Plaintiffs also argue that Seald-Sweet's ballot should be disqualified because its board members representing the Indian River District of Florida, a district not regulated by the marketing order, determined Seald Sweet's vote on the approval of the order.

The plaintiffs argue next that only producers or growers of the types of oranges actually regulated by the marketing order were entitled to vote on the approval of the order. Instead, producers of all types of oranges were permitted to vote in the referendum without reference to whether their crop was subject to regulation.

Finally, the plaintiffs contend that the referendum was unfairly conducted because the Referendum Agent supplied ballots to a grower organization supporting the issuance of the marketing order, but refused to supply ballots to a grower organization opposed to the Order.

*Findings of Fact*

On the basis of the record presented on the motion for summary judgment, the Court finds that the following material facts are not in dispute:

1. During the period from September 10 to September 30, 1970, a referendum was conducted to determine producer approval of the issuance of Marketing Order 914. In that referendum, 4,164 votes were cast, 123 were disqualified, 3,099 voted in favor of the order, and 942 voted against it. The total qualified votes represented approximately 45,300,000 boxes of fruit; the amount of oranges shipped fresh in interstate commerce during the representative period was approximately 12,500,000 boxes.[6]

2. Seald-Sweet has 35 members, 22 from the Interior District and 13 from the Indian River District. All the members of Seald-Sweet are packers, that is, they must have their own packing houses. Approximately two-thirds of the members are cooperative associations of producers; the remaining members are independent packing houses. Prior to the referendum, Seald-Sweet solicited membership lists from its respective members for the purpose of casting a single ballot in the referendum. Fourteen of the 22 Interior District members responded and Seald-Sweet cast a single ballot representing 1,474 votes for those members. Of the 14 members, 10 were producer coops accounting for 1,344 votes, the other four were independent packing houses accounting for 130 votes. Seald-Sweet was required

5. 7 U.S.C. § 608c(12).
   Approval of cooperative association as approval of producers.
   (12) Whenever, pursuant to the provisions of this section, the Secretary is required to determine the approval or disapproval of producers with respect to the issuance of any order, or any term or condition thereof, or the termination thereof, the Secretary shall consider the approval or disapproval by any cooperative association of producers, bona fide engaged in marketing the commodity or product thereof covered by such order, or in rendering services for or advancing the interests of the producers of such commodity, as the approval or disapproval of the producers who are members of, stockholders in, or under contract with, such cooperative association of producers.

6. The representative period was August 1, 1969, through July 31, 1970.

to cast all 1,474 votes either for or against the marketing order and could not split the votes.

3. Seald-Sweet's vote was determined by its Board of Directors without consulting its members or the individual producers. Nineteen board members were present at the Directors meeting on September 16, 1970. Eleven represented 16 of the 22 Interior Members and eight represented 10 of the 13 Indian River members. All 19 directors voted to cast Seald-Sweet's ballot in favor of the marketing order.

4. If a producer cooperative chose to cast a ballot on behalf of its members, the members were not entitled to vote. If such a member cast a ballot, it was disqualified. Some of the 123 ballots were invalidated for this reason. The record does not show the results of any ballots cast by members of cooperatives where the cooperative cast a ballot which did not represent that member. Thus, the record does not show whether the remaining eight Interior District members of Seald-Sweet, for whom Seald-Sweet did not vote, cast their own ballots, or if they did, whether they were disqualified.

5. The official ballot used in the referendum asked each producer of oranges to state the number of boxes produced by him in the Interior District of Florida during the representative period. The producer was directed to exclude Temples and Murcotts, but not to exclude any other type of orange or to indicate whether his production was for fresh shipment in interstate commerce or some other purpose. The ballot asked each producer to state whether he was a member of a cooperative marketing organization, but did not ask if he was a stockholder in or under contract with a cooperative.

The plaintiffs' first contention is that Seald-Sweet's ballot should be disqualified because Seald-Sweet is not a cooperative association of producers within the meaning of the statute and regulations. The Act describes a "producer" as one who is engaged in the production for market of the commodity specified in the marketing order.[7] In authorizing cooperatives to vote in producer referenda, 7 U.S.C. § 608c(12)[8] describes a cooperative association of producers as comprised of producers and engaged in marketing the product covered by the proposed order. The regulations governing the conduct of producer referenda entitle a cooperative association to vote if it is engaged in marketing the product proposed to be regulated by the marketing order. 7 C.F.R. § 900.402.[9] Moreover, the proposed marketing order defines a "producer" as a "grower" having a proprietary interest in the crop produced. 7 C.F.R. § 914.7.[10]

█ The gist of this statutory and regulatory scheme is that those producers and growers engaged in marketing the produce covered by the proposed order must approve the issuance of such an order. Where, however, those same growers have banded together into a cooperative association, the statute and

---

7. 7 U.S.C. § 608c(8)(A), (9)(B)(i).

8. Note 5, *supra*.

9. § 900.402 Voting.
    (a) Each person who is a producer, as defined in this subpart, at the time of the referendum and who also was a producer during the representative period, shall be entitled to only one vote in the referendum, except that: . . .
    (2) a cooperative association of producers, bona fine engaged in marketing the commodity or product thereof proposed to be regulated, or in rendering services for or advancing the interest of the producers of such commodity or product, may, if it elects to do so, vote, both by number and total volume, for the producers who are members of, stockholders in, or under contract with such association.

10. § 914.7 Producer.
    "Producer" is synonymous with "grower" and means any person who is engaged in the production for market of oranges grown in the Interior District in Florida and who has proprietary interest in the oranges so produced.

regulations allow them to vote through the association. Thus, Seald-Sweet was entitled to vote in the referendum if it was a producer or a cooperative association of producers. Neither party argues that Seald-Sweet is a producer, but disagree on whether it is a cooperative association of producers. The plaintiffs would concede that Seald-Sweet is a cooperative association under Florida law, but argue that it is not an association of *producers* because none of its members are producers within the meaning of the Agricultural Adjustment Act and the implementing regulations.

Article VI of the Articles of Incorporation of Seald-Sweet requires that members of Seald-Sweet either be producers of citrus fruits or cooperative associations of such producers.[11] In either case, the member must have packing facilities available. In fact, it is not disputed that at the time of the referendum, Seald-Sweet had 14 members in the Interior District of Florida; ten were cooperative associations of producers and four were packing houses. The conclusion urged by the plaintiffs is that Seald-Sweet's members are simply not producers; therefore, Seald-Sweet cannot be a cooperative of producers.

The defendants argue, however, that the Court should look through the intermediate cooperatives and consider the individual producers as members of Seald-Sweet instead of as members of the cooperative members of Seald-Sweet.[12] If Congress had intended this interpretation, it would have been a simple matter to phrase the statute in terms more consistent with that result. Instead, Congress and, more importantly, the Department of Agriculture have defined a producer as a grower or one directly engaged in producing—not marketing or processing—oranges and who has a proprietary interest in the oranges produced. This language clearly excludes Seald-Sweet's members, none of whom meet this test.

The plaintiffs also urge that Seald-Sweet's ballot should be invalidated because Seald-Sweet permitted its board members from the Indian River District, a non-regulated, competing district, to participate in the decision to cast Seald-Sweet's ballot in favor of the order. Seald-Sweet has 35 members, 22 from the Interior District and 13 from the Indian River District. Only members who handle at least 400,000 boxes of fruit a year are entitled to be represented by a board member. Since some members handle less than that volume, the result is that 26 members are represented by 19 directors.

Eligibility to vote in the referendum is restricted to producers and cooperative associations engaged in orange production within the Interior District.[13] The theory is that those who are to be governed should have the voice in the choice of the government. Neither producers nor cooperatives from the Indian River District are permitted to vote

---

11. The articles and by-laws of Seald-Sweet contain several provisions relating to Seald-Sweet's members and their respective "producer-members". For example, a standardized contract is provided for use by cooperative members of Seald-Sweet in dealing with producers. Thus, these documents make clear a distinction between "cooperatives" and "producers". The defendants would eliminate this distinction and interpret the statutory language to make "cooperative association of producers" synonymous with "cooperative association of cooperatives". This result cannot be reached without equating "producer" and "cooperative".

12. Defendants wish to apply to this case a "lookthrough" argument and urge that the Internal Revenue Service applies a similar doctrine to farmer cooperatives, citing Rev. Rul. 69-651, 1969-2 Cum.Bull. 135. A conclusion or ruling of one department or agency, however, does not govern determinations that must be made by another agency under a different statute and for different purposes. *See* Herndon v. United States, 203 F.Supp. 536 (E.D.S.C.1962).

13. The marketing order must be approved by producers who "have been engaged, within the production area specified in such marketing agreement or order", in production of the product specified. 7 U.S.C. § 608c(8)(A).

since their interests might be contrary to those of the Interior District. Similarly, the Court feels that board members who represent producers or other cooperatives in the Indian River District should not have a voice in the approval of marketing restrictions for the Interior District.

The Court concludes that Seald-Sweet is not a "cooperative association of producers" within the meaning of the Agricultural Adjustment Act and the regulations thereunder and, therefore, was not entitled to cast a ballot in the referendum. The Court also concludes, as an alternate ground for disqualifying Seald-Sweet's ballot, that Seald-Sweet improperly permitted its board members from the Indian River District to participate in the decision to cast the ballot approving the marketing order.

The plaintiffs next contend that only producers of those types of oranges actually regulated by the proposed order should be eligible to vote in the producer referendum. The plaintiffs rely on Vaughn-Griffin Packing Company v. Freeman, 423 F.2d 1094 (5th Cir.1970), in which the Court of Appeals for the Fifth Circuit held that, for the purpose of determining whether the required number of handlers had entered into marketing agreements, the determinative quantity of fruit was that actually covered by the marketing order and not the total quantity of fruit produced.[14]

The statute requires that the marketing order cannot take effect unless it is approved by "two-thirds of the producers who . . . have been engaged . . . in the production for market of the commodity specified therein." 7 U.S.C. § 608c(8)(A).[15] The proposed order defines "producer" as a "grower . . . engaged in the production for market of oranges grown in the Interior District of Florida . . . ." 7 C.F.R. § 914.7.[16] The order further defines oranges as "all varieties . . . grown in the Interior District of Florida but not oranges of the so-called kid glove type such as Temple, Murcott Honey and King oranges." 7 C.F.R. § 914.4.[17] Thus, it would appear, initially, that the commodity "specified" in the order is any orange except the varieties specifically excluded. The plaintiffs argue, however, that "specified" has a broader meaning and is synonymous with "covered" or "regulated." For example, 7 C.F.R. § 914.55,[18] exempts several categories of fruit from regulation under the marketing order. The plaintiffs urge that producers of such exempted fruit need not and should not have a vote in the producer referendum under the decision in Vaugh-Griffin.

The defendants contend, on the other hand, that Vaughn-Griffin is distin-

14. The statute requires that a specified percentage of "handlers" or shippers enter into a marketing agreement in addition to approval by a producer referendum before a marketing order be issued. In Vaughn-Griffin, the dispute was whether the required percentage of handlers had signed marketing agreements. In this case, the dispute centers around the required number of producers voting in the referendum.

15. Note 4, supra.

16. Note 10, supra.

17. § 914.4 Oranges.
"Oranges" means all varieties of Citrus sinenis, Osbeck, grown in the Interior District of Florida but not oranges of the so-called kid glove type such as Temple, Murcott Honey and King oranges.

18. § 914.55 Fruit not subject to regulation. Except as otherwise provided in this section, any person may, without regard to the provisions of §§ 914.42 through 914.49 and the regulations issued thereunder, ship oranges for the following purposes:
    (a) To a charitable institution for consumption by such institution;
    (b) To a relief agency for distribution by such agency;
    (c) To a commercial processor for conversion by such processor into canned or frozen products or into a beverage base;
    (d) By parcel post; and
    (e) In such minimum quantities, types of shipments, or for such purposes as the committee with the approval of the Secretary may specify.

guishable because it involved the number of handlers entering a marketing agreement instead of the number of producers voting in a referendum. Defendants also point out that, in the case of a marketing agreement, the statute uses the language "the commodity or product thereof *covered* by such order," whereas in the case of a producer referendum, the language is "commodity *specified* therein." Thus, argue the defendants, Congress clearly intended that different quantitative criteria be used for marketing agreements than for producer referenda. The distinction urged by the defendants, however, is not carried through the statutory and regulatory scheme with consistency. For example, 7 U.S.C. § 608c(12),[19] limits the voting franchise to cooperatives of producers "engaged in marketing the commodity or product thereof *covered* by such order." Even more restrictive language is found in the Agriculture Department's regulations governing producer referenda. Under the regulations, a cooperative is entitled to vote if it is a "cooperative association of producers, bona fide engaged in marketing the commodity or product thereof proposed to be *regulated* . . . ."[20]

The import of this language is that Congress and the Agriculture Department intended that those who would be regulated by the proposed order should be the ones to vote on the question of approval. In this case only oranges shipped in fresh form in interstate commerce are regulated or covered by the order. Among the exempt categories of oranges, the most notable is the exemption from regulation of oranges shipped to a commercial processor for conversion into canned or frozen products. Producers of oranges intended for this market may have an interest in market controls which is adverse to producers of oranges for the fresh market. Herein lies the logic of giving the vote only to those who will be regulated. Thus, in the disputed referendum, the total vote accounted for over 45 million boxes of oranges, while the product regulated—oranges shipped in fresh form in interstate commerce—amounted to approximately 12 million boxes. Even if every producer of the commodity covered by the order voted against approval, the required percentage for approval could be obtained if the producers not covered by the order voted for approval. The defendants argue that this distinction between covered and uncovered oranges is not workable with respect to orange growers because the grower often does not know to which market his fruit will go while it is still on the tree in contrast to the grapefruit handlers in *Vaughn-Griffin,* in which the government urged the position now adopted by the plaintiffs. While it is true that the handler or shipper generally may have a

---

19. 7 U.S.C. § 608c(12) :

Approval of cooperative association as approval of producers.

Whenever, pursuant to the provisions of this section, the Secretary is required to determine the approval or disapproval of producers with respect to the issuance of any order, or any term or condition thereof, or the termination thereof, the Secretary shall consider the approval or disapproval by any cooperative association of producers, bona fide engaged in marketing the commodity or product thereof covered by such order, or in rendering services for or advancing the interests of the producers of such commodity, as the approval or disapproval of the producers who are members of, stockholders in, or under contract with, such cooperative association of producers.

20. 7 C.F.R. § 900.402, set out in note 9, *supra.* Congress' inconsistency in the use of terms extends to other phrases in the same statute. Section 608c(8) dealing with marketing agreements refers to "the production or marketing area defined" in the order, but Section 608c(8) (A), governing producer referenda, uses "the production area specified". The same dichotomy appears in other sections relating to marketing agreements and producer referenda. The defendants would not insist that Congress was thinking of two different marketing or production areas because it used the term "specified" rather than "defined" when dealing with producer referenda. Nor would they so argue if the choice was between "specified" and "covered," although that is precisely the argument they make here.

better working knowledge of the destination of the fruit he handles, in this case the eligibility to vote in the producer referendum is directly related to crop production during a prior representative shipping period. The defendants do not maintain that it is impossible for the producer to determine where he shipped his fruit during the representative period. Nor do they give any justification for allowing a producer to vote in the referendum, knowing that he produces fruit solely for the frozen market or solely for an intrastate market.

Since the official ballots used in the referendum do not contain sufficient information to distinguish between producers of covered and uncovered fruit, there is no way of determining whether two-thirds of the producers engaged in the production of the commodity covered in the order approved its issuance.[21] Therefore, the issuance of the order cannot be sustained and both the referendum and the marketing order must be invalidated.

As a further ground for invalidating the referendum and order, the plaintiffs contend that the referendum was unfairly conducted by the referendum agent. Plaintiffs argue that the referendum agent made official ballots available to Florida Citrus Mutual, a grower organization openly favoring the market order, but refused to provide ballots to United Growers and Shippers, a similar organization opposed to the issuance of the order. The uncontradicted evidence is that Florida Citrus Mutual would not provide a membership list to the agent for the purpose of distributing ballots to its members, but made available its addressograph equipment and operators to address envelopes for the agent's use in mailing ballots to Mutual's members. The agent provided no ballots to the organization itself, but merely used the addressed envelopes provided by Mutual to mail ballots.

United Growers also refused to supply its membership list to the agent and the agent likewise declined to provide ballots directly to the organization, since neither United nor Mutual were entitled to vote. There is no evidence and no contention that United offered to make mailing arrangements with the agent similar to those made by Mutual. Nor is there any evidence or contention that the referendum agent refused to supply a ballot to any grower qualified to vote.

### Conclusion

It is the opinion of the Court that the relief sought by the plaintiffs should be granted. The relief is limited to invalidating the referendum; and the Court does not reach any of the plaintiffs' arguments concerning the legality of the provisions of the Marketing Order itself. In accordance with this opinion, it is

Ordered:

1. The plaintiffs' motion for summary judgment is granted and the producer referendum is declared invalid.

2. The defendants are hereby enjoined from enforcing the provisions of Marketing Order 914 unless and until the issuance of the order is approved by a referendum conducted in accordance with this opinion.

---

21. In this connection, it may be well to note that the ballot not only fails to distinguish between covered and uncovered fruit, but it also fails in other respects. For example, a cooperative association of producers may vote on behalf of producers who are members of, stockholders in, or under contract with, the association. The official ballot only asks whether the producer is a member. Thus it is possible for a producer to vote who is also represented on the ballot of a cooperative if he is in one of the categories not listed on the ballot. In addition, the procedure for disqualifying votes cast by members of cooperatives may result in the cancellation of otherwise valid votes. If a producer indicates on his ballot that he is a member of a cooperative, the referendum officials disqualify his ballot if the coop has voted. There appears to be no inquiry, however, into whether that producer was represented on the coop's ballot.